# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JANET CARLOW, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CAUSE NO. 2:12-CV-146 |
| | § | |
| DANIEL RIVERA, ROBERT | § | |
| CRAMER, JUDY SUTTON, and | § | |
| MARK CAZALAS, | § | |
| *Defendants.* | § | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GREG ABBOTT
Texas Attorney General

DANIEL T. HODGE
First Assistant Attorney General

DAVID C. MATTAX
Deputy Attorney General for Defense Litigation

JAMES "BEAU" ECCLES
Chief, General Litigation Division

**DANIEL C. PERKINS**
Texas Bar No. 24010301
Assistant Attorney General
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120
(512) 320-0667 FAX
dan.perkins@texasattorneygeneral.gov

*ATTORNEYS FOR DEFENDANTS*

MAY 6, 2013

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iii

I.      INTRODUCTION ...........................................................................................1

II.     SUMMARY OF THE ARGUMENT .............................................................2

        A.      Carlow Lacks Evidence To Support Each Element Of A First
                Amendment Retaliation Claim Against All Four Defendants ................2

        B.      Each Defendant Is Entitled To The Protections Of Qualified
                Immunity................................................................................................2

        C.      Several of Carlow's Purported Claims Are Barred By Limitations ........3

III.    STATEMENT OF FACTS ..............................................................................3

IV.     STANDARD OF REVIEW .............................................................................11

V.      ARGUMENT AND AUTHORITIES.............................................................12

        A.      Carlow Cannot Prevail On The Merits Of Her Claims Because She
                Lacks Evidence To Support Each Element Of A First Amendment
                Retaliation Claim Against All Four Defendants ....................................12

                1.      Carlow cannot establish facts sufficient to show a valid
                        claim for First Amendment retaliation against Defendant
                        Cramer for failure to promote in November 2010 .....................13

                2.      Carlow has no evidence to establish that Defendant Cramer
                        was involved in any way with the decision to terminate her
                        employment...............................................................................14

                3.      The clear, undisputed evidence shows that Human
                        Resources employees made the decision to terminate Carlow ..................15

                4.      Carlow has insufficient evidence to establish causation
                        between her protected speech and the actions of Cazalas,
                        Sutton, and/or Rivera concerning the decision to terminate
                        her employment .........................................................................16

B.    Even If Carlow Could Make A Substantive Case On The Merits, Each Defendant Is Entitled To The Protections Of Qualified Immunity................................................................................................17

C.    Carlow's Claims Premised On Retaliatory Transfer and Retaliatory Disciplinary Action Are Barred By Limitations...................................................21

VI.    CONCLUSION........................................................................................................22

CERTIFICATE OF SERVICE ........................................................................................24

## TABLE OF AUTHORITIES

**Cases**

*Allard v. Holder,* 494 Fed.Appx. 428 (5th Cir. 2012) (unpublished) ................................. 17

*Alton v. Texas A&M Univ.,* 168 F.3d 196 (5th Cir. 1999) ........................................ 12

*Alvarado v. Texas Rangers,* 492 F.3d 605 (5th Cir. 2007) ................................. 12, 13

*Anderson v. Liberty Lobby, Inc.,* 466 U.S. 2427 (1986) ........................................ 11

*Beattie v. Madison County Sch. Dist.,* 254 F.3d 595 (2001) ................................ 17

*Brumfield v. Hollins,* 551 F.3d 322 (5th Cir. 2008) ........................................ 18

*Bazan ex rel. Bazan v. Hidalgo County,* 246 F.3d 481 (5th Cir. 2001) ................ 18

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ............................................... 11

*Charles v. Grief,* 522 F.3d 508 (5th Cir. 2008) ............................................... 19

*Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 121 S.Ct. 1508 (2001) ............... 17

*Colson v. Grohman,* 174 F.3d 498 (5th Cir. 1999) ........................................... 12

*Evans v. City of Houston,* 246 F.3d 344 (5th Cir. 2001) ..................................... 17

*Gerhart v. Hayes,* 217 F.3d 320 (5th Cir. 2000) ............................................. 17

*Gonzales v. Dallas County, Tex.,* 249 F.3d 406 (5th Cir. 2001) ........................... 19

*Harlow v. Fitzgerald,* 457 U.S. 800 (1982) ................................................... 18

*Hitt v. Connell,* 301 F.3d 240 (5th Cir. 2002) ............................................... 22

*Hunter v. Bryant,* 502 U.S. 224 (1991) ....................................................... 18

*Jackson v. Johnson,* 950 F.2d 263 (5th Cir. 1992) .......................................... 21

*Lytle v. Bexar County, Tex.,* 560 F.3d 404 (5th Cir. 2009) ................................ 18

*Malley v. Briggs,* 475 U.S. 335 (1986) ........................................................ 18

*Marshall v. East Carroll Parish Hosp. Serv. Dist.,* 134 F.3d 319 (5th Cir. 1998) ... 11

*Martin v. John W. Stone Oil Distributor, Inc.,* 819 F.2d 547 (5th Cir. 1987) ......... 11

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977) ....................................17, 19

*Nixon v. City of Houston,* 511 F.3d 494 (5th Cir. 2007) ...................................................................12

*Pegram v. Honeywell, Inc.,* 361 F.3d 272 (5th Cir. 2004) .............................................................. 12

*Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808 (2009) ............................................................. 18

*Piotrowski v. City of Houston,* 237 F.3d 567 (5th Cir. 2001) ....................................................21, 22

*Price v. City of San Antonio,* 431 F.3d 890 (5th Cir.2005) *(per curiam)* ..........................................21

*Raggs v. Miss. Power & Light Co.,* 278 F.3d 463 (5th Cir.2002) ....................................................17

*Ramsey v. Henderson,* 286 F.3d 264 (5th Cir. 2002)......................................................................14

*Ruiz v. Whirlpool, Inc.,* 12 F.3d 510 (5th Cir. 1994)......................................................................12

*Saucier v. Katz, 533 U.S.* 194, 121 S.Ct. 2151 (2001) ...................................................................18

*Schaefer v. Gulf Coast Regional Blood Cntr.,* 10 F.3d 327 (5th Cir. 1994) ....................................21

*Stewart v. RSC Equipment Rental, Inc.,*
    485 Fed.Appx. 649 (5th Cir. 2012) (unpublished) ................................................................17

*Transamerica Ins. Co. v. Avenell,* 66 F.3d 715 (5th Cir. 1995)......................................................11

*Wheeler v. Miller,* 168 F.3d 241 (5th Cir. 1999)...........................................................................12

## Statutes

Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a).........................................................................21

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| JANET CARLOW, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CAUSE NO. 2:12-CV-146 |
| | § | |
| DANIEL RIVERA, ROBERT CRAMER, | § | |
| JUDY SUTTON, and MARK CAZALAS, | § | |
| *Defendants.* | § | |
| | § | |

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

TO THE HONORABLE NELVA RAMOS, UNITED STATES DISTRICT JUDGE:

Defendants DANIEL RIVERA, ROBERT CRAMER, JUDY SUTTON, and MARK CAZALAS, hereby file their *Motion for Summary Judgment,* and in support thereof, would show this Court the following:

### I.
### INTRODUCTION

Plaintiff, Janet Carlow has brought this suit against Daniel Rivera, Robert Cramer, Judy Sutton, and Mark Cazalas, all Department of Aging and Disability Services ("DADS") employees, alleging First Amendment Retaliation. According to Carlow, she spoke out against various practices at the Corpus Christi State Supported Living Center where she worked and was terminated for what she said. She claims each of the Defendants was part of "institutionalized retaliation" against her. [Ex. 1 at 76]. Because Carlow cannot come forward with evidence to support essential elements to her claim and because no reasonable jury could conclude that the Defendants would not have terminated Carlow even in the absence of her complaints, they are

each entitled to summary judgment on Carlow's claims.  Accordingly, Defendants respectfully request the Court to dismiss this suit against them.

## II.
## SUMMARY OF THE ARGUMENT

**A.**    **Carlow Lacks Evidence To Support Each Element Of A First Amendment Retaliation Claim Against All Four Defendants.**

Carlow's claims lack substantive merit because she utterly fails to establish the causation between her protected speech and the adverse actions about which she complains.  First, other than temporal sequence, there is no evidence in the record establishing that any of the Defendants were motivated to take any action against Carlow because of her speech; however, the proximity of her speech to the adverse actions forecloses any inference of retaliation.  Carlow was not terminated until a year after her last protected speech.  Further, there is no evidence in the record that any of the Defendants played a role in denying her the promotion she sought in 2010.  The uncontested evidence demonstrates that Carlow's application was not forwarded to the decision-makers by the DADS Human Resources contractor, Access HR, and that her missing application was not brought to Defendant Cramer's attention until after the decision to hire someone else had been made.  Because Carlow can show no causal link between the adverse actions and her protected speech, the Court should grant the Defendants summary judgment.

**B.**    **Each Defendant Is Entitled To The Protections Of Qualified Immunity**

Carlow's claims are barred in their entirety by the doctrine of Qualified Immunity.  Even if the Court assumes that she has properly pleaded and established facts setting forth a violation of her clearly established First Amendment rights, Carlow cannot overcome the fact that the Defendants' actions were reasonable in light of the clearly established law.  The facts show that Carlow was habitually late and/or absent from work, was counseled about these matters *ad*

*nauseum,* and routinely failed to correct her behavior.  Moreover, the evidence demonstrates that Carlow was uncooperative with an APS Investigator, causing the investigator to reschedule important interviews to avoid confrontation, and failed to give priority to the investigator's preferred schedule.  Further, the investigator felt the incident was of such importance that it warranted mention to Carlow's supervisor.  Given the totality of her behavior, the decision by DADS Human Resources to terminate her employment cannot be termed "unreasonable," nor can the Defendants' decision to follow HR's instruction.  Therefore, the Defendants are entitled to summary judgment on the qualified immunity defense.

**C.      Several of Carlow's Purported Claims Are Barred By Limitations**

Carlow appears to claim that several allegedly retaliatory actions occurred against her throughout the last five years of her employment.  Although she focuses on her termination in 2011 and promotion denial in 2010, Carlow also claims that she was involuntarily transferred in January 2008, and issued a disciplinary action (Decision Making Leave) in 2009.  To the extent these latter two claims may be properly characterized as First Amendment Retaliation claims, they are barred by the two-year statute of limitations in Texas on Section 1983 claims.

**III.**
**STATEMENT OF FACTS**

Plaintiff, Janet Carlow was a Clinical Psychologist/Associate Psychologist III at the Corpus Christi State Supported Living Center ("CCSSLC").  [Doc. 1 at 8, ¶30].[1]  The first five years of Carlow's employment are not at issue here.

At some point during the relevant time Carlow was employed at the CCSSLC, she was supervised by each of the Defendants. Judy Sutton became the Director of Behavioral Health

---

[1] Plaintiff's Original Complaint is filed as Document No. 1 in the PACER system and will be referred to as "Doc. 1" for purposes of citation in this Motion.

Services at the CCSSLC on August 15, 2011, and she oversaw the Department in which Carlow worked. [Ex. 5 at 7-8]. She supervised Dr. Robert Cramer at that time, who was serving as the CCSSLC's Clinical Psychologist, [Ex. 5 at 10], and who no longer served in any supervisory capacity. [Ex. 4 at 18]. Sutton also supervised Daniel Rivera, who was an Associate Psychologist V. *Id.* Rivera directly supervised Carlow and two other Associate Psychologist IIIs. [Ex. 5 at 10]. From July 15, 2009 through November 30, Mark Cazalas was the Assistant Director of Programs of the CCSSLC. [Ex. 3-7]. In September, he became the acting Interim Director of the CCSSLC. *Id.*

According to Carlow, after she spoke out about what she perceived to be lax supervision at the CCSSLC, she began to suffer retaliation for her speech at the hands of her supervisors. [Doc. 1 at 9-10, ¶¶33-37; Ex. 1 at 21]. In early 2007, Carlow "reported abuse, neglect and exploitation by staff against the residents many of which were caused by a lack of Unit Director supervision at the Dolphin Unit." [Doc. 1 at 9, ¶33; Ex. 1 at 17-18]. She purports to have made the report to the CCSSLC's Unit Director, the Superintendent, and Dr. Robert Cramer, who was the center's Chief Psychologist. [Doc. 1 at 9, ¶ 33; Ex. 1 at 18]. The following September, Carlow renewed her complaints at a public meeting held at Corpus Christi City Hall by legislators following a resident suicide at the center. [Doc. 1 at 9, ¬¶ 34; Ex. 1 at 19-20]. None of the Defendants attended this meeting. [Ex. 1 at 23].

According to Carlow, sometime in 2008, "they" removed her from the Dolphin home where she was the psychologist, and "placed [her] in a room that was in another building, and [she] wasn't allowed to talk to any clients," or other staff members. [Ex. 1 at 24]. According to Carlow, the reason she was removed was to "give [her] the time [she] need to work on [her] paperwork." [Ex. 1

at 56].  Carlow does not know who made the decision calling it an "administrative" one and admitting "I'm just not certain of all the different…players at that time."  [Ex. 1 at 24-25].

In the Pacific home, to which Carlow as transferred, the residents she worked with were severely to profoundly intellectually disabled, whereas the residents in the Dolphin home were mildly to moderately intellectually disabled.  [Ex. 2 at 16].  According to Carlow, upon the transfer, her caseload was doubled.  [Ex. 1 at 61].  Yet Carlow agreed that her greater caseload was not necessarily more work.  [Ex. 1 at 62].  Although she had more clients in the Pacific unit, she had less patient interaction with the Pacific residents and more paperwork whereas in the Dolphin unit she spent more time dealing with fewer patients and their behaviors and thus had less paperwork.  [Ex. 2 at 17].  Although Carlow's patient numbers doubled, her workload "balanc[ed] out."  *Id.*

Shortly after Carlow was transferred to the Pacific home, she was issued a Decision Making Leave ("DML") because it was believed she had fallen into leave without pay and falsified documentation.  [Doc. 1 at 10, ¶ 39; Ex. 1 at 65].  According to Carlow, no Defendant other than Rivera had anything to do with this DML.  [Ex. 1 at 71].  Later, it was discovered that the Unit Director, Rachel Rodriguez, had incorrectly entered Carlow's time causing her to fall into leave-without-pay status.  Carlow claims to have informed Rivera that she was actually on medical leave, [Ex. 1 at 70], but does not know how the mistake occurred, [Ex. 1 at 72-73].  She further asserts that Rivera went along with the DML because he was forced to support Rodriguez, but not because of any retaliatory motive.  [Ex. 1 at 80].

Carlow filed three grievances related to the 2009 DML, and all three were sustained.  [Ex. 1 at 81].  The DML was rescinded, and Carlow was never placed on probation.  Carlow received everything she sought through the grievance process.  [Ex. 1 at 82].

In September 2010, Carlow spoke at an all-hands or "town hall" meeting at the CCSSLC about "policies that had been implemented which removed Active Treatment Staff from spending time directly with the residents. . . .", [Doc. 1 at 11, ¶ 41(1); Ex. 1 at 83], and about issues related to the DADS's budget, [Doc. 1 at 12, ¶ 41(2); Ex. 1 at 83-84].  Carlow asserts that the Defendants were "angered and possessed a retaliatory animus against [her] as a result of Plaintiff engaging in this protected speech."[Doc. 1 at 12, ¶42.

Carlow points to two adverse employment actions and her ultimate termination as retaliation for her protected speech.  First, Carlow argues that in retaliation against her speech, in November 2010, her application for an Associate Psychologist V position, [Ex. 1 at 84], was not considered, [Ex. 4 at 13].  But the unchallenged evidence shows that when the human resource computerized program compiled a list of all completed applications, Carlow's was not among those on the list.  *Id.*  A human resource employee collected copies of the completed applications and provided them to Dr. Cramer and the other panel member.  *Id.* at 16.  After the position had been filled, when Carlow expressed a concern, it was discovered that her application was incomplete because it lacked a signature and thus, did not make the list.  *Id.* at 14.  Carlow's application was never before the hiring panel.  [Ex. 4 at 15].

Carlow also points to a February 2011 email written by Cramer to Rivera and another DADS employee that contains the following language:  "In addition, the more she talks (as she did to chris adams at town hall), the more I and my dept look bad." [Ex. 2-3].  At the time Cramer wrote this statement, he was no longer Carlow's supervisor.  [Ex. 4 at 19].  Cramer was offering an opinion in response to a question about moving Carlow from one home in Pacific to another.  [Ex. 4 at 9, 19].  Cramer explained that "[l]ooking back at it, [the statement] doesn't make much sense because it wasn't my department, nor was I in charge of

anything at the time.  However, the idea that psychologists practicing behavioral strategies with which they have no interest nor motivation to learn, doesn't necessary make the department look as if it's working correctly."  [Ex. 4 at 9].

Carlow claims that at a February 2011 meeting, Rivera and Cazalas made negative reference to her protected speech.  Carlow had complained to Rivera that she was having problems with some of the other CCSSLC employees.  [Ex. 3 at 27; Ex. 2 at 20].  Carlow contends that Gila Montelongo, who was Sutton's assistant, [Ex. 2 at 20], made negative references to her speech at the September 2010 town hall meeting, [Ex. 1 at 102].  According to Carlow, Montelongo "basically said that [she] had no right to say the things [she] said; that [she] was making people look stupid."  [Ex. 1 at 102].  She further claims that Cazalas stated he "could understand why she was upset."  *Id.*  Carlow admits, however, that neither Cazalas nor Rivera ever stated they agreed with Montelongo's statements.  [Ex. 1 at 105-106].

Carlow kept irregular hours at work.  [Ex. 1 at 191].  She would work very late hours, and then would come in late the next day.  *Id.*  She would also work beyond her regularly-scheduled 40-hour week.  Rivera and Bruce Boswell, who replaced Cazalas, developed a concern that Carlow was not reporting any hours beyond the 40 hours she was required to work each week, either costing DADS money or opening it up to potential liability.  [Ex. 1 at 192-93].   On March 1, 2011, Rivera and Boswell explained to Carlow why it was problematic for her to work overtime and reminded her of her 9:00 a.m. to 6:00 p.m., Monday through Friday schedule.  [Ex. 1 at 192].

In August 2011, Sutton learned that Carlow had changed her timesheet, after Rivera had approved it, and noting on the timesheet that Rivera had approved of the change, even though he had not.  [Ex. 5 at 12; Ex. 5-2].  After Sutton learned of this falsification, she reviewed Rivera's Employee Development Notes for Carlow and conferred with Rivera.  [Ex. 5 at 14].  The documentation notes

demonstrated that beginning in January 2011, Carlow "had recorded 57 unscheduled days of tardiness and during the same time period 32 days of unexcused absences for which Ms. Carlow had no coverage arranged." [Ex. 5-2;  Ex. 8].  More specifically, the notes showed that on February 15, Rivera, Cramer, and Bruce Boswell met with Carlow to discuss her schedule and provide attendance guidelines.  Carlow signed the notes on March 1, indicating her agreement to work 9:00 a.m. to 6:00 p.m. and no other time, without supervisor approval.  *Id.* (2/15/11 entry).  She agreed she would not accumulate any more than 140 hours of compensatory time.  *Id.*  Carlow agreed to produce two documents per week, and was given access to additional space for complete her work.  *Id.*  Even after this counseling session, Carlow continued to have attendance problems.  *Id.* (3/22/11 through 4/14/11 entries).  On April 15, Rivera once again met with Carlow to stress the importance of seeking supervisory approval to work overtime.  *Id.* (4/15/11 entry).  Carlow continued to keep erratic work hours, but improved somewhat.  *Id.* (4/19/11 through 7/5/11 entries).

In addition to her continued attendance problems, on July 21, Carlow was late for training.  When Rivera explained to her that she was late and needed to attend the training, Carlow cursed at him "using the 'F' word then stormed out of [his] office heading for the training still yelling at [him.]"  *Id.* (7/21/11 entry).  And on August 9, Carlow, while she was serving as Psychologist on Duty, was nowhere to be found during an ongoing restraint.  She "showed up at the restraint 4 hours after the restraint occurred…."  *Id.* (8/9/11 entry).

The notes also revealed that this was not the first time Carlow was alleged to have failed to cooperate with an investigation.  [Ex. 1-3].  In December 2010, Carlow failed to return repeated phone calls and visits from a Department of Family and Protective Services investigator.  [Ex. 6 at 1-2].  Carlow later apologized for delaying the investigation, stating "I am aware of, and want to apologize for, causing a delay in the DFPS investigation of [].  As a former DFPS investigator, I

know how important investigations are. . . . It will not happen again." [Ex. 1-3]. CCSSLC policy provides that failure to cooperate in an investigation can result in termination. [Ex. 3 at 13].

After reviewing the notes and speaking to Rivera, Sutton contacted Human Resources. [Ex. 5 at 14-15]. Human Resources reviewed the relevant documents, [Ex. 5 at 15], and discussed with Sutton the documents and Carlow's apparent "ongoing pattern of problems" related to her time, leave, and quality of work with Sutton. [Ex. 5 at 13-15; see Ex. 5-2]. Sutton also discussed the issue with Cazalas, who no longer had any supervisory authority over the psychologists, indicating to him that they were "leaning toward" terminating Carlow. [Ex. 5 at 20]. He simply advised Sutton to "follow the directives of HR." [Ex. 5 at 20].

On September 13, 2011, while Sutton and Human Resources were already considering whether to terminate Carlow for her ongoing attendance and performance issues, Rita Calderon, an Adult Protective Services ("APS") Investigator, complained to Rivera that Carlow had been uncooperative in an APS investigation she was conducting. She stated to Rivera, "You know what, I'm going to come back and talk to her tomorrow. But I'm going to send you something because I don't appreciate this. I don't appreciate when people don't cooperate. That's neglect to the clients." [Ex. 2 at 23]. The next day, Calderon then sent Rivera an email detailing the interaction she had with Carlow. [Ex. 2-4 (Calderon email to Rivera)]. The entirety of the email stated:

> Mr. Rivera,
>
> I had an issue arise yesterday with the psychologist on Ribbon Fish 4 which I would like to bring to your attention. At approximately 2:30 p.m. on 09/13/11 I attempted to interview Ribbon Fish 4 Psychologist Janet Carlow. When I arrived on the home, Ms. Carlow was in her office. I knocked on the door, Ms. Carlow looked up and saw me standing at the door and ignored my knock and continued what she was doing. I then attempted to open the door but it was locked. Ms. Carlow at this point opened the door. I informed her I was an investigator with APS and I needed to speak with her regarding an investigation that I had been assigned. Ms. Carlow informed me that she would not be able to interview with me as she was in the middle of a "staffing". I told her I did not want to interrupt a "staffing" and asked if I could come back later to discuss the allegation with her. Ms. Carlow stated show would not be able to meet with me until 09/14/11. I agreed to come back on 09/14/11 and before departing asked Ms. Carlow if the QMRP for RF 4

was also in the staffing.  Ms. Carlow stated the QMRP was in the conference room and she would get her for me.  The QMRP approached me and I introduced myself and informed her I would need to speak to her.  I asked the QMRP if she was also in the "staffing" and was informed they were doing Quarterly Reviews.  I told the QMRP I wouldn't interrupt a "staffing" but I would interrupt Quarterly Reviews.  I then informed Ms. Carlow after I was done speaking with the QMRP, I would speak with her.  The QMRP met with me in the conference room on the unit.  About half way through the interview, Ms. Carlow knocked on the door and entered stating she needed to get her things, that she wouldn't be able to speak to me today as she had forgotten she had HRC and she was presenting.  Before I could reply, the QMRP reminded Ms. Carlow she was obligated to speak to investigators and APS investigations take priority.  Ms. Carlow did not acknowledge what the QMRP had said and proceeded to gather her things.  Ms. Carlow asked me if I would be able to come back tomorrow like I had agreed to do so while in her office.  Due to the tension between Ms. Carlow and the QMRP, I did not insist Ms. Carlow meet with me yesterday and agreed to come back in the morning.  This matter will be addressed as a concern in my investigative report, but I wanted you to be aware of the situation as well.  If you have any question regarding this issue, please call me. Thank you.

Rita Calderon
APS/Unit 83 MHMR
(361)808-6369 office
(361)813-7095 cell
4201 Greenwood Dr
Corpus Christi, TX 78416

[Ex. 2-4].   Even after promising that it would never happen again, Carlow delayed an investigation, knowing as a former DFPS investigator how important investigations are.  [Ex. 1-2].   Rivera forwarded the email to Sutton. [Ex. 5 at 22; *see* Ex. 2 at 24 (email is accurate description of what Carlow told Rivera the day before)]. Although Carlow emphasizes that she and Calderon agreed to continue the investigation on September 14, Rivera clearly explained that any delay is "not supposed to happen". . . because it prolongs the investigation and amounts to neglect to the client who is the subject of the investigation.  [Ex. 2 at 25].

At the time this interaction between Calderon and Carlow took place, Sutton, Rivera and the Human Resources Department were already processing the previously-mentioned DML for Carlow but had not decided what they were going to do.  "[They] were discussing that with HR." [Ex. 2 at 27, 29].  But when they learned that Carlow had delayed Calderon's APS investigation, "it was determined that a Notice of Possible Disciplinary Action [was] a more appropriate course

of action." [Ex. 2 at 29; Ex. 5-1]. The Calderon incident "was just another accumulation of things, and [] was just one more reason added" to the notice. [Ex. 2 at 30; Ex, 5 at 23].

On September 30, HR provided a Notice of Termination to Rivera and Sutton Rivera issued a Notice of Termination to Carlow. [Ex. 2 at 31; Ex. 5-2].

## IV.
## STANDARD OF REVIEW

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). A movant not bearing the burden of proof is not required to present evidence in order to put the plaintiff's claims in issue. *Transamerica Ins. Co. v. Avenell,* 66 F.3d 715, 718 (5th Cir. 1995). Instead, the movant can satisfy her burden by "pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325. Once accomplished, the burden shifts to the plaintiff to produce competent evidence sufficient to survive summary judgment. *Anderson v. Liberty Lobby, Inc.,* 466 U.S. 242, 256-57 (1986). To avoid defeat, the plaintiff must demonstrate a genuine issue of material fact as to each element of every disputed claim. *Id.* at 247-48. A fact is "material" when "it might affect the outcome of the suit," and "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

To satisfy her burden, a plaintiff may not rely on unsupported assertions, conclusory allegations, speculation, conjecture, or subjective belief, but must present evidence that would be admissible at trial. *Marshall v. East Carroll Parish Hosp. Serv. Dist.,* 134 F.3d 319, 324 (5th Cir. 1998) (citations omitted); *Martin v. John W. Stone Oil Distributor, Inc.,* 819 F.2d 547, 549 (5th Cir. 1987). The evidence proffered "must set forth specific facts that show there is a

genuine issue for trial" and be examined by the court in the light most favorable to the nonmovant. *Ruiz v. Whirlpool, Inc.,* 12 F.3d 510, 513 (5th Cir. 1994) (internal citations omitted); *Colson v. Grohman,* 174 F.3d 498, 506 (5th Cir. 1999). Nevertheless, "[w]here critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton v. Texas A&M Univ.,* 168 F.3d 196, 199 (5th Cir. 1999). "If the record as a whole could not lead a rational jury to find for the nonmoving party, there is no genuine issue for trial and summary judgment is warranted." *Wheeler v. Miller,* 168 F.3d 241, 247 (5th Cir. 1999) (footnote omitted).

## V.
## ARGUMENT AND AUTHORITIES

**A.     Carlow Cannot Prevail On The Merits Of Her Claims Because She Lacks Evidence To Support Each Element Of A First Amendment Retaliation Claim Against All Four Defendants.**

To make a proper Section 1983 claim for First Amendment retaliation, Carlow must demonstrate: (1) that she suffered an adverse employment action; (2) that she spoke as a citizen on a matter of public concern; (3) that her interest in the speech outweighed the government's interest in the efficient provision of public service; and (4) that the speech caused the adverse employment action. *Nixon v. City of Houston,* 511 F.3d 494, 497 (5th Cir. 2007). Defendants do not contest that Carlow has pleaded facts purporting to identify that she suffered one or more adverse employment action.[2] *Pegram v. Honeywell, Inc.,* 361 F.3d 272, 283 (5th Cir. 2004);

---

[2] While it is clear that termination and denial of a promotion are adverse actions (*accord Pegram,* 361 F.3d at 283), it appears to be a somewhat open question whether Plaintiff's 2008 transfer from Dolphin to Pacific Unit is also an adverse action. *See Alvarado,* 492 F.3d at 614 (holding that a denial of requested transfer could be an adverse action if position sought was objectively better). Here, Defendants contend that Plaintiff's 2008 transfer was purely lateral: she performed the same duties in each unit. In contrast, the 2009 DML is not an ultimate decision under *Pegram,* and is therefore barred. Further, as noted in Section B, above, the 2008 transfer and 2009 DML are barred by limitations.

*Alvarado v. Texas Rangers,* 492 F.3d 605, 614 (5th Cir. 2007).  Further, for the purposes of summary judgment, Defendants do not contest that Plaintiff spoke out on matters that may arguably be considered matters of public concern.  Finally, for the purposes of summary judgment, Defendants do not contest Plaintiff's claim that her rights outweigh her employer's interests; however, Carlow has pleaded no facts to establish a valid Section 1983 claim because she has provided insufficient facts to establish a causal link between her speech and the adverse action(s).

1.    **Carlow cannot establish facts sufficient to show a valid claim for First Amendment retaliation against Defendant Cramer for failure to promote in November 2010.**

Carlow blames Cramer[3] for failing to promote her in November 2010 and attempts to ascribe a retaliatory motive to his alleged actions.  Yet, she fails to back up her conclusory assertion with any competent summary judgment evidence.   Her allegations against Cramer are just part of her unsubstantiated belief that there was ongoing "institutionalized retaliation" against her.   The uncontroverted, clear evidence shows that Carlow's application for the position was never completed and thus never considered by Dr. Cramer or the panel responsible for filling the open position.  Moreover, Dr. Cramer clearly testified that he was not the sole decision maker with respect to filling the position, but was instead on a panel with at least one other member.  So to the extent Carlow attempts to link any retaliatory motive to Cramer, she cannot do so without considering the motives of the other unnamed, non-party panel members.

The uncontradicted evidence demonstrates that Carlow applied for an Associate Psychologist V position in November 2010 [Ex. 1 at 84], and that her application was not considered for the promotion.  [Ex. 4 at 13].  Further, it is undisputed that Cramer served as the

_____

[3] Carlow does not allege that Sutton, Rivera, and/or Cazalas played any role in denying her the promotion, nor is there any evidence to suggest it.  To the extent Carlow may assert that the other Defendants are responsible in whole or in part for the denial of promotion in 2010, those claims are unsupported and the Defendants move for summary judgment on those claims as well.

hiring manager for that position and was one of the members of the panel that made the selection. [Ex. 4 at 14-15]. Cramer further testified that the promotion process was managed by Access HR, a contractor used by DADS to, among other things, accumulate and screen applications for employment and promotion. [Ex. 4 at 13]. According to Cramer's unrebutted testimony, the completed applications were provided to the hiring panel by Access HR, and that Carlow's application was not among them. [Ex. 4 at 13-14; Ex. 7 at 1-2]. Carlow offers no evidence to suggest that Cramer intentionally refused to include her application, or that he acted in any manner that could reasonably be considered inappropriate or retaliatory. Rather, the uncontested evidence demonstrates that Access HR screened Carlow's application (for whatever unknown reason) and that Cramer and the hiring panel did not have the application to consider.

Further, it is clear that once Carlow brought the matter to Cramer's attention (after the selection had been made) he caused an investigation to be mounted concerning why Carlow's application was not forwarded. [Ex. 4 at 14]. The record conclusively establishes that Cramer received all of the completed applications (which excluded Carlow's) from Ruth Dominguez, the local CCSSLC human resources representative, who printed them off of the Access HR program. [Ex. 4 at 16-17]. There is simply no evidence that Cramer deliberately refused to consider Carlow for the position. Carlow's suspicions and speculation that he did are not competent summary judgment evidence. *Ramsey v. Henderson,* 286 F.3d 264, 269 (5th Cir. 2002). Because Carlow cannot demonstrate causation, her claims against Cramer premised on the lost promotion are fundamentally deficient and summary judgment is proper.

**2.    Carlow has no evidence to establish that Defendant Cramer was involved in any way with the decision to terminate her employment.**

Carlow presents no evidence at all to establish that Cramer was involved in the decision to terminate her employment, nor is there any such evidence from the record. Carlow admits that

she has no knowledge or evidence to establish that Cramer was involved in the decision to terminate her employment.  [Ex. 1 at 150-53].  Moreover, Cramer testified that in September 2011, when Carlow was terminated, he was no longer the Chief Psychologist, but rather, had been employed since December 15, 2010, as "clinical psychologist," with no supervisory role whatsoever.  [Ex. 4 at 18– 19].  Thus, Cramer was not part of the chain of command that recommended and ultimately acted to terminate Carlow's employment.  Though Carlow testified that she believed Cramer would have input in her termination [Ex. 1 at 150-54], she presents no evidence that he did so.  The unrebutted testimony demonstrates that Cramer in fact had no role in the termination.  He was no longer Chief Psychologist in September of 2011, having stepped down almost one year earlier to fill the Clinical Psychologist role.   [Ex. 4 at 18-19].  Accordingly, there is no causation between Carlow's termination and any act by Cramer.  Therefore, the Court should grant summary judgment on Carlow's Section 1983 claim premised on termination to the extent she asserts it against Defendant Cramer.

### 3. The clear, undisputed evidence shows that Human Resources employees made the decision to terminate Carlow.

Sutton and Rivera have repeatedly testified that they were not the decision makers when it came to terminating Carlow's employment.   Indeed, when pressed at her deposition about who actually made the decision, Sutton unequivocally responded that neither she nor Rivera "made the decision," and that they had "no input in the decision." [Ex. 5 at 46].  The following colloquy from Sutton's deposition makes clear that the decision was not made by any party to this suit:

Q.    *Who made the decision?*

A.    *HR.*

Q.    Okay.  You had no input in the decision.

A.    No.   They, after reviewing the documentation and we issued the Notice of Possible Disciplinary Action, they we reviewed her rebuttal, and we received –

Q.    Who at HR?

A.      Laura Eli [sic].

Q.      Did you make a recommendation at all?

A.      I don't recall.

Q.      You don't make the decisions about whether or not you want to keep an employee under you?  Is that what you're saying?

A.      My understanding of the process is that HR provides us with direction and guidance, and we follow their direction and guidance.

Q.      And my question was, is it your testimony that you do not make decisions whether or not to terminate or hire employees underneath you?

A.      I am part of the process.

Q.      And do you, as part of that process, do you indicate whether or not you want to fire somebody or hire somebody?

A.      I do.

Q.      Okay.  Did you indicate that you wanted to issue the termination with Ms. Carlow?

A.      No.  *I was directed by HR to do it.*

[Ex. 5 at 46-47 (emphasis added)].  Thus, not only can Carlow come forward with no evidence that Sutton was aware of her protected activity, nor can she point to any evidence that Sutton held negative views of that speech or had a retaliatory motive for taking any actions with respect to Carlow, but the clear, unequivocal evidence shows that HR directed Sutton and thus Rivera to terminate Carlow.   Further, although Sutton discussed Carlow's possible termination with Cazalas, [Ex. 5 at 20], there is no evidence that Cazalas influenced Sutton, Rivera or anyone at Human Resources regarding the ultimate decision to terminate Carlow's employment.  [Ex. 5 at 20 (recommending that Sutton "follow the directives of HR"].   Just as with Cramer, Carlow cannot produce competent summary judgment evidence that shows that Cazalas, Sutton or Rivera had any final decision-making authority with respect to Carlow's termination.

**4.      Carlow has insufficient evidence to establish causation between her protected speech and the actions of Cazalas, Sutton, and/or Rivera concerning the decision to terminate her employment.**

In addition to the clear evidence that Sutton, Cazalas, and/or Rivera did not make the termination decision, Carlow further has no evidence to impute causation because her

termination occurred far too remotely from the occurrence of the allegedly protected speech. The Fifth Circuit has explained that "a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes." *Evans v. City of Houston,* 246 F.3d 344, 354 (5th Cir. 2001) (internal quotation marks and citation omitted) (emphasis added). However, on repeated occasions, the same Court has consistently found insufficient evidence of causation where the delays were substantially longer than four months. *See Raggs v. Miss. Power & Light Co.,* 278 F.3d 463, 471–72 (5th Cir.2002) (holding five-month lapse precluded inference of causal link from temporal proximity); *see also Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508 (2001) (holding 20-month delay precludes causation finding); *Stewart v. RSC Equipment Rental, Inc.,* 485 Fed.Appx. 649, 653 (5th Cir. 2012) (unpublished) (holding seven-month lapse precluded causation finding); *Allard v. Holder,* 494 Fed.Appx. 428, 432 (5th Cir. 2012) (unpublished) (holding two-year delay precludes causation finding). Here, Carlow last spoke out on or around September of 2010, approximately one year before she was terminated. [Doc. 1 at 11-12, ¶¶ 40, 47]. Under established precedent, the temporal proximity between her speech and the decision to terminate her employment is too great to support a causation finding. Accordingly, she fails to meet her causation element and the Court should grant summary judgment to the Defendants.

**B.    Even If Carlow Could Make A Substantive Case On The Merits, Each Defendant Is Entitled To The Protections Of Qualified Immunity.**

Assuming Carlow can come forward with some evidence of the essential elements of her claim, the Defendants are entitled to qualified immunity if they can establish "that they would have come to the same conclusion in the absence of the protected conduct." *Beattie v. Madison County Sch. Dist.,* 254 F.3d 595, 602 (2001); *Gerhart v. Hayes,* 217 F.3d 320, 321 (5th Cir. 2000) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977)). "[G]overnment officials

performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). This qualified immunity is immunity from suit and not just a defense to liability. *Id.* This doctrine provides "'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant,* 502 U.S. 224, 229 (1991) (citing *Malley v. Briggs,* 475 U.S. 335, 343 (1986)).

A court considering whether a defendant is entitled to qualified immunity must conduct a two-pronged inquiry. One prong entails the court's consideration of whether the facts alleged, taken in the light most favorable to the plaintiff, show a violation of a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151 (2001), overruled in part by *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 818 (2009). The other prong requires a court to determine within the specific context of the case whether the violated constitutional right was clearly established at the time in question. *Id.* at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

If the court answers both the constitutional violation and the clearly established question in the affirmative, the officer is not entitled to qualified immunity. *Lytle v. Bexar County, Tex.,* 560 F.3d 404, 410 (5th Cir. 2009). If, however, the answer to either question is answered in the negative, immunity applies and the lawsuit against the government official may not proceed. *Id.* Although qualified immunity is nominally an affirmative defense, upon its assertion, the burden shifts to the plaintiff to negate it. *Brumfield v. Hollins,* 551 F.3d 322, 326 (5th Cir. 2008); *Bazan ex rel. Bazan v. Hidalgo County,* 246 F.3d 481, 489 (5th Cir. 2001).

When qualified immunity and the *Mt. Healthy* affirmative defense are both at issue, as they are here, the key question for the Court is "whether it would have been objectively reasonable for an officer to conclude that terminating [Carlow's] employment did not violate [her] rights under the First Amendment because [her actions] would have caused [her] termination notwithstanding [her protected activity.]  *Gonzales v. Dallas County, Tex.*, 249 F.3d 406, 412 (5th Cir. 2001).  In other words, if the employer is able to show that it "would have [taken the same adverse employment action] even in the absence of the protected conduct," . . . "then the protected conduct in question does not amount to a constitutional violation justifying remedial action."  *Charles v. Grief*, 522 F.3d 508, 516 n.28 (5th Cir. 2008) (citing *Mt. Healthy*, 429 U.S. at 287).

Although the evidence shows that Cramer played no role in Carlow's termination and that Cazalas,[4] Sutton and Rivera were part of the termination "process," even if they were involved, the record is replete with evidence to show that any objectively reasonable supervisor would not have believed he or she was violating Carlow's First Amendment rights because they would have terminated her employment even in the absence of her protected conduct.  The record shows that Carlow was either late to work or altogether absent from work 89 times between January and August 2011.  [Ex. 5-2].  It further shows that she falsified her time records, and indicated in writing that Rivera had approved them, even though he had not.  *Id.*  Additionally, Carlow violated the CCSSLC's "routine course of practice…that on the day of the investigator's arrival, that they interview all pertinent parties."  [Ex. 5 at 39].  The APS investigator clearly complained about Carlow's reaction to the investigator's attempt to speak to her, and indicated that the matter would be indicated as

---

[4] The evidence in the record suggests that Cazalas' only role in the process was to sign review the DML and Notice of Possible Disciplinary Action.  [Ex. 3 at16-17].

a "concern" in final report.  [Ex. 2-4].  Carlow does not dispute the facts as articulated by the APS investigator, but attempts to minimize the issue by stating that the investigator agreed to come back the following day.   Although this may be true, it ignores the undisputed, unequivocal policy that requires employees to make time for investigators on the day they arrive, and that failure to do so could amount to neglect of the clients.

Even before the September 13 incident, Carlow's continued employment at the CCSSLC was in question.   Indeed, Sutton testified that they were leaning toward terminating her employment when the September 13 incident occurred.  [Ex. 5 at 20].  The evidence shows that the incident was simply one more reason why Carlow's continued employment at the CCSSLC was no longer feasible, and that any reasonable supervisor could have concluded that termination of her employment would be proper even in the absence of Carlow's 2010 protected speech.  In addition to failing to cooperate promptly with Rita Calderon at Adult Protective Services, Carlow had been cited for numerous continued instances of tardiness and/or unapproved absences [Ex. 5-1 at 2-3], falsification of time records [*Id.* at 3], consistent performance issues [*Id.* at 3-4], and using Facebook for hours during work time [*Id.* at 4; Ex. 5 at 53].   Further, Carlow had previously been counseled about the seriousness of APS Investigations in conjunction with a similar incident in December 2010, when an APS Investigator had substantial difficulty getting Carlow to return phone calls for an interview.   [Ex. 6 at 1-2].  The totality of the evidence provides more than sufficient bases[5] for a reasonable state official in the Defendants' positions to take the same action to terminate Carlow, whether or not she had engaged in protected speech a

---

[5] In fact, Rivera testified about another psychologist at CCSSLC – Ms. Mendoza – who was placed on DML and ultimately terminated for failure to perform her duties adequately.  [Ex. 2 at 18-19].  Nothing in the record establishes that Mendoza ever spoke out on matters of public concern, and in fact, Carlow testified that, as far as she knew, she was the only employee to speak out on matters of public concern against CCSSLC at any of the town hall meetings she attended.  [Ex. 1 at 174-76].

year earlier.   For these reasons, the Defendants' actions were objectively reasonable and the Court should grant summary judgment.

**C.     Carlow's Claims Premised On Retaliatory Transfer and Retaliatory Disciplinary Action Are Barred By Limitations.**

Carlow appears to assert that she was subjected to adverse employment actions other than termination on several occasions, ostensibly in retaliation for having spoken out on matters of public concern.   Specifically, she asserts the following adverse employment actions prior to her September 2011 termination:  (1) 2008 transfer from the Dolphin Unit to the Pacific Unit resulting in a significant increase in work load; (2) Decision-making Leave (DML) issued in January 2009; and (3) November 2010 denial of promotion.   [Doc. 1 at 8-12, ¶¶ 32-43].   However, Carlow did not file the instant lawsuit until May 10, 2012, rendering only the last of these three potential claims within the two-year statute of limitations.   Accordingly, to the extent Carlow asserts claims premised on the 2007 transfer and the 2009 DML, those claims are barred as a matter of law.

Section 1983 has no express statute of limitations; instead, district courts must look to the statute of limitations for personal injury claims in the forum state's own laws.   *Price v. City of San Antonio,* 431 F.3d 890, 892 (5th Cir.2005) (per curiam).   In Texas, the statute of limitations for personal injury actions is two years.   TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a); *see also Schaefer v. Gulf Coast Regional Blood Cntr.,* 10 F.3d 327, 331 (5th Cir. 1994).   "Ordinarily, a cause of action under [S]ection 1983 accrues when the plaintiff 'knows or has reason to know of the injury which is the basis of the action.' " *Price,* 431 F.3d at 893 (quoting *Jackson v. Johnson,* 950 F.2d 263, 265 (5th Cir. 1992)); *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001).   Thus, Carlow was required to assert her Section 1983 claims within two years of the date upon which she reasonably should have become aware of each retaliatory action.

Here, Carlow became aware of the alleged injuries she suffered as a result of the 2008 transfer and the 2009 DML on the very days those actions were communicated to her, three and four years respectively before she filed this lawsuit.  *See Hitt v. Connell,* 301 F.3d 240, 246 (5th Cir. 2002) (stating that the limitation period begins to run "when the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured" (quotation omitted)); *Piotrowski,* 237 F.3d at 576 (stating that a cause of action accrues when a plaintiff knows of the existence of an injury and the connection between the injury and the defendant's actions).  Carlow's own pleadings illustrate that she became aware of her transfer in 2008 and began working on the Pacific Unit immediately after transfer.  [Doc. 1 at 10, ¶ 38]. Likewise, she clearly pleaded facts establishing that she was aware of the January 2009 DML in January 2009, when it was communicated to her.  [Doc. 1 at 10 ¶ 39].  Yet, Carlow did not file the instant lawsuit until May 2012, more than three years after each of these acts, and long after the statute of limitations had run.  Accordingly, to the extent Carlow seeks to hold any Defendant liable for these two acts, her claims are clearly barred by the statute of limitations; therefore, the Court should grant summary judgment to Defendants on them.

## VI.
## CONCLUSION

FOR THE FOREGOING REASONS, the Defendants respectfully request that the Court grant their Motion for Summary Judgment.  First, Carlow fails to meet her burden to establish causation on the merits of her Section 1983 claims.  She cannot show that any of the Defendants made the decisions to deny her a promotion and/or terminate her employment. Second, even if Carlow could articulate facts to establish a claim on the merits, the Defendants are entitled to the protections of qualified immunity because they all acted in an objectively

reasonable manner given the known facts and the clearly established law.  Finally, to the extent Carlow premises any of her claims on her 2008 transfer and her 2009 disciplinary action (DML), those claims are barred by the two-year statute of limitation.  Accordingly, the Court should dismiss Carlow's claims in their entirety.

Respectfully submitted,

GREG ABBOTT
Texas Attorney General

DANIEL T. HODGE
First Assistant Attorney General

DAVID C. MATTAX
Deputy Attorney General for Defense Litigation

JAMES "BEAU" ECCLES
Chief, General Litigation Division


/s/ Daniel C. Perkins
**DANIEL C. PERKINS**
Attorney-in-Charge
Texas Bar No. 24010301
Southern District No. 24123
Assistant Attorney General
Texas Attorney General's Office
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120
(512) 320-0667 FAX
dan.perkins@texasattorneygeneral.gov

ATTORNEYS FOR DEFENDANT

### CERTIFICATE OF SERVICE

I certify that a copy of the above *Defendants' Motion for Summary Judgment* was served by the following manner, on the **6th day of May 2013,** upon the following individuals at the listed addresses:

Chris McJunkin
2842 Lawnview St.
Corpus Christi, Texas 78404

*ATTORNEYS FOR PLAINTIFF*

☒ Via CM/ECF at cmcjunkin@stx.rr.com
☐ Via Facsimile
☐ Via Regular Mail
☐ Via Certified Mail Return Receipt Requested
☐ Via Overnight Mail or UPS/FedEx


/s/Daniel C. Perkins
**DANIEL C. PERKINS**
Assistant Attorney General
General Litigation Division